## Gregg *against* Patterson.

Strictly and properly speaking, a warrant and survey thereon, although the purchase money be paid to the state, does not constitute a *legal* in contradistinction to an *equitable* title for the land embraced by it.    The warrant is a mere authority to survey the land for the benefit of the warrantee or the owner thereof. It contains no grant or conveyance of the land.    This is effected by the execution of a patent-deed on the part of the state, after the survey shall have been made and returned on the warrant.    But a patent does not give the patentee any superior advantage, in respect to the land, unless he be legally entitled to it.    For a warrantee, without a patent, if he be legally and equitably entitled to a patent, may recover the land in ejectment from the patentee, who is not entitled thereto, as he had no right to obtain it.

If the vendor of lands, holding them under warrants and surveys, without patents, agrees by articles of agreement made with the vendee, to give the vendee immediate possession of them, which is done, and agrees also well and sufficiently, on or before a certain future day, to convey them in fee, by such deed or deeds as the counsel of the vendee shall reasonably advise and devise, on the vendee paying the one-half of the purchase money, and securing the other half, by giving bonds and mortgage on the lands, to be paid in two annual instalments, with the interest thereon semi-annually; and upon the vendee failing to pay, and secure the purchase money, the vendor or his heirs or devisees take possession of the lands again without legal process or the consent of the vendee, or those claiming from him, they cannot retain the possession until the vendee or those claiming from him tender or pay the purchase money due; but the vendee or those claiming from him may recover in ejectment the possession without tendering or paying the purchase money, or bringing it into court.

But if the vendor or those claiming from him recover the possession by legal process, or by the consent of the vendee or of those claiming under him, he or they may retain the possession until they are paid the purchase money due or it is tendered, which must be done before the institution of an ejectment to recover the possession.

Also, if after the vendor, or his heirs or devisees, have recovered possession by ejectment after failure to pay the purchase money, and the claim of the vendee has become vested by successive mesne conveyances, in two persons, as tenants in common, one of whom conceiving himself entitled to the whole claim of the

R *

[Gregg v. Patterson.]

original vendee exclusively, pays the whole of the purchase money, which had become payable, to the heirs or devisees of the original vendor, and takes conveyances from them, whereby he acquires their possession and right to the land, he may retain the possession of the whole against the other tenant in common, or his heirs, until they pay or tender the one-half of the purchase money paid by him, which must be paid or tendered before they can maintain an ejectment to recover the possession.

So if the tenant in common, after paying the whole of the purchase money, is compelled to bring an action of ejectment against persons in possession and claiming a portion of the land under an adverse title, for the purpose of recovering the possession thereof, in which he succeeds, but has been obliged to expend about $400 in prosecuting the suit and effecting a recovery of the possession, he will not be compelled to let the heirs of the other tenant in common into the possession of their undivided moiety until they pay or tender him the one-half of such expense, which if it cannot be agreed on, as to amount, by the parties, may be ascertained and fixed by the jury who try the cause; and the court, though the verdict be in favour of the plaintiffs, will take care that execution shall not be had until one-half of such expense be paid.

But where such tenant in common, in possession of the land, erects buildings and makes substantial and valuable improvements thereon, without the consent of the heirs of the other tenant in common, though done under the impression, most probably, that he was sole owner of the land, and the heirs of the other tenant in common most probably ignorant of their right and claim to it, he cannot claim to be reimbursed one-half of the cost and expense of erecting such buildings and making such improvements, by the heirs of the other tenant in common. For this he is without a remedy, further than the rents, issues and profits received by him from the property may reimburse him.

ERROR to the Common Pleas of *Beaver* county.

This was an action of ejectment brought by Oliver Ormsby Gregg, Isaac Gregg, Sidney J. Gregg, Moses F. Eaton and Sarah E. his wife (late Sarah E. Gregg), heirs at law of Isaac Gregg, deceased, against James Patterson, Robert Saddler, James Richards, Henry Maloy and Jeremiah Mead, to recover the possession of the undivided half of a tract of land, situate in Brighton township, Beaver county, containing 440 acres and allowance, being a tract surveyed on a warrant in the name of William Barker. The facts of the case are fully set forth in the opinion of this court.

The case was argued here by

*Agnew* and *Biddle*, for the plaintiffs in error, who cited 3 *Watts* 238; 7 *Serg. & Rawle* 154; 5 *Binn.* 120; 3 *Binn.* 7; 3 *Watts & Serg.* 435; 10 *Serg. & Rawle* 43; 2 *Ibid.* 355; 3 *P. R.* 425; 8 *Serg. & Rawle* 390; 4 *Watts & Serg.* 22; 2 *Serg. & Rawle* 500; 5 *Binn.* 504; 3 *Watts & Serg.* 484; 2 *Ibid.* 100; 5 *Watts* 394; *Serg. Const. Law* 149 *et seq.*; 2 *P. R.* 507; 2 *Rawle* 90; 2 *P. R.* 22; 4 *Watts* 464; 13 *Serg. & Rawle* 14.

*Pearson* and *Metcalf*, for the defendants in error, referred to 2 *Wash. C. C.* 33, 448; 1 *Stor. Eq.* 375; 2 *Sug. Vend.* 295, 305, 327; 2 *Binn.* 40; 3 *Rawle* 334; 4 *Watts* 464; 6 *Watts* 137; 16 *Serg. & Rawle* 269; 4 *Serg. & Rawle* 301; 3 *Ibid.* 432; 4 *Binn.* 41; 8 *Serg. & Rawle* 496; 10 *Watts* 140; 2 *Yeates* 346; 6 *Watts* 95.

[Gregg v. Patterson.]

KENNEDY, J.—From an abstract given of the evidence it appears that Daniel Brodhead was the owner of two land warrants, bearing date the 3d April 1792, for 400 acres each, one in the name of Joseph Williams, and the other in the name of William Barker. They were surveyed on land adjoining each other, in the month of April 1794, on the west side of Big Beaver Creek, opposite the Middle Falls. That by an article of agreement, dated the 18th August 1801, Daniel Brodhead contracted to sell the two tracts of land surveyed upon the warrants aforesaid to David Hoops for the consideration of $3200, payable one-half thereof on the delivery of the deed of conveyance, and the other half in two equal annual instalments with interest, and agreed to convey the same by a good and sufficient deed to the said Hoops, his heirs and assigns, in fee, on or before the 1st day of May next ensuing the date of the article. If the tracts should be found to contain together more than 800 acres, it was agreed that Hoops should pay in proportion for the excess; and it was further agreed that Hoops should enter into and take immediate possession, and enjoy the profits; and upon this contract Hoops paid, on the day of the date, $100, for which a receipt was endorsed on the articles.

David Hoops shortly afterwards entered into possession, and subsequently his right and title under this contract became vested, by sundry successive conveyances, in Isaac Wilson, who, by deed dated the 27th August 1810, conveyed the undivided moiety of the warrant claims to the above mentioned tracts, containing 800 acres, derived as aforesaid, to Jeremiah Barker and Isaac Gregg in fee, as tenants in common, and not as joint tenants. He also formed a partnership in the iron-making business with Jeremiah Barker and Isaac Gregg, and with them carried on the furnace and forge, which had been erected on the premises. The business continued between one and two years, and was found unprofitable, the firm of Wilson, Barker & Gregg having sunk about $13,000.

Isaac Wilson, by deed dated the 25th April 1812, conveyed the remaining moiety of the said tracts of land to Jeremiah Barker and Isaac Gregg as tenants in common, and not as joint tenants, for the consideration of $15,000, of which $1000 was paid in hand, and fourteen judgment bonds of $1000 each taken for the balance, and judgments thereupon entered in the Court of Common Pleas of Beaver county on the 11th May 1812. These judgments were paid after the death of Isaac Gregg, by Jeremiah Barker (upon executions and otherwise) to Isaac Wilson and his assignees, at various times and in various manners (excepting $900 of the last bond, which was not shown to have been paid), a considerable portion whereof was paid by Oliver Ormsby. At the time Isaac Wilson sold the remaining moiety of the lands, he also sold his interest in the personal property, stock and debts of the firm, to Barker and Gregg, who undertook to settle and pay

the claims against the firm. The individual accounts of the several partners stood as follows, on closing the books of the firm, to wit:

| | | | |
|---|---|---|---|
| To Isaac Wilson there was due | - | - | $5466.93 |
| " Isaac Gregg there was due - | - | - | 1954.85 |
| " Jeremiah Barker there was due | - | - | 4967.31 |

By the agreement of Wilson, Barker and Gregg, the books of the firm were to be settled by Barker and Gregg, and the balance due to Wilson to be paid to him in one year. Of this balance Wilson never received any part, except the sum of $28. After the second sale of Wilson to Barker and Gregg last mentioned, the iron-making business was continued by Barker and Gregg upon the premises until the death of Gregg, which occurred in the month of April 1813. The business proved unprofitable, and they sunk money. After the death of Gregg, Barker continued in possession until he sold the premises to Oliver Ormsby in the year 1815.

On the 7th May 1813, letters of administration were taken out, upon the estate of Isaac Gregg, from the register's office of Beaver county, by Lydia Gregg, his widow, and Oliver Ormsby her brother. On the 25th September 1824, Oliver Ormsby settled his administration account of the estate of Isaac Gregg, which was confirmed at April Term 1825, leaving a balance in favour of the accountant of $982.13. By that account it further appears, that no assets of the firm of Barker and Gregg came into the hands of the administrator on account of the interest of Gregg in that firm.

By an article of agreement, dated 15th January 1815, Jeremiah Barker contracted with Oliver Ormsby to sell and convey to him the two tracts of land aforesaid, situate on the west bank of the Big Beaver, opposite the middle falls, surveyed for Daniel Brodhead (along with other property) for the consideration of $32,000, payable $2000 thereof 1st April 1815; $3000 thereof on the 1st January 1816; and $3000 thereof annually thereafter until all should be paid. Five thousand of the purchase money were contingent, and only to be paid on the perfecting of the warrant title against the claims of the adverse settlers. This agreement recites that the liens against the real estate of Barker and Gregg are sufficient to condemn the same; and Barker covenants to make arrangements at an approaching sheriff's sale, to enable him to sell and convey to Ormsby; and Ormsby agrees to throw no obstacles in the way whatever to Jeremiah Barker purchasing at sheriff's sale, and making a complete title to Ormsby. Also, that the bonds to be given by Oliver Ormsby for the purchase money were to be framed so that they should be applied to the payment of the liens against the property, and the balance (after payment of the liens) to Jeremiah Barker and the administrators or guar-

[Gregg v. Patterson.]

dians of the children of Isaac Gregg, according to their respective interests in the property.

On the 24th February 1813, an amicable action in case was entered in the Court of Common Pleas of Alleghany county, No. 35, of April Term 1813, between Samuel Carswell and Isaac Wilson, Jeremiah Barker and Isaac Gregg, partners, under the firm of Isaac Wilson & Co. Upon the record, the death of Isaac Gregg was suggested, and on the 14th of April 1814, judgment was confessed therein by Jeremiah Barker, one of the defendants, as per writing filed, for $1361.72, in full of the original account and interest. In this case, a *testatum fieri facias*, No. 1, of April Term 1815, was issued to the sheriff of Beaver county against all the defendants, Isaac Wilson, Jeremiah Barker and Isaac Gregg, reciting the judgment of $1361.72, as against them all; and upon this writ, the sheriff of Beaver county levied upon the right and title of the defendants to the aforesaid two tracts of land, described in the levy as 100 acres of land on the west side of Big Beaver, adjoining the falls, Brighton, on which were erected one furnace, &c. &c.; also, the warrant claim of 700 acres adjoining, (besides other tracts of land). Inquisition was held, and the property condemned. A *testatum venditioni exponas* to the sheriff of Beaver county was thereupon issued, No. 45, of August Term 1815, in the same case against all the defendants, reciting the aforesaid *fieri facias*. To this writ the sheriff of Beaver county returned, " Land sold to Jeremiah Barker for the sum of $16,500. Received. James Ross, Esq. receipt in full for debt, interest and attorney's fee, he being the attorney for plaintiff. The balance of the costs paid to me by Mr Barker. J. Coulter, sheriff."

In pursuance of this sale, Jonathan Coulter, Esq., sheriff of Beaver county, executed and delivered a deed to Jeremiah Barker, dated 5th September 1815, for the said 100 acres, and warrant claim of 700 acres adjoining the two tracts aforesaid, sold as the property of Isaac Wilson, Jeremiah Barker and Isaac Gregg, at the suit of Samuel Carswell, for $15,000, acknowledged on the 5th September 1815, before the judges of the Court of Common Pleas of Beaver county.

In part execution of this contract, Jeremiah Barker by deed, dated 7th February 1817, for the consideration of $22,900, conveyed to Oliver Ormsby, in fee, 100 acres of the land, lying within the survey on the warrant of Joseph Williams, except about half an acre, which, according to the testimony of Francis Hoops, lies within the survey on the warrant of William Barker. The remainder of the 800 acres was not conveyed by Jeremiah Barker until the year 1831, when by deed, dated 5th December of that year, he conveyed to Oliver Ormsby " all the right, title, interest, property and claim of him, the said Jeremiah, of, in, to and out the said article of agreement, entered into between the said Daniel Brodhead and David Hoops, and of, in and to the said two tracts

[Gregg v. Patterson.]

of land therein mentioned and described," to have and to hold to him, his heirs and assigns for ever.

In 1815, Oliver Ormsby went into possession of the 100 acres, and with Robert Black, a partner, carried on the forge and furnace until 1816. In 1816, he went into partnership with John Dickey, and continued in himself until 1827. When Ormsby purchased, the remainder of the 800 acres was in the adverse possession of settlers, who had gone into possession to make actual settlements under the law of the 3d April 1792. In 1817, —— Johnson claiming under the title of Daniel Brodhead, upon a recovery in an ejectment brought in the United States' Circuit Court, dispossessed all who were in the possession of the two tracts. John Dickey, on behalf of Mr Ormsby, without going out, took a lease, and remained in possession of that portion which he had in occupancy. In 1819, Thomas Ross and Samuel Jackson, the adverse settlers, brought their ejectment, recovered, and on the 20th May 1820, retook possession under a writ of *habere facias possessionem.* This recovery and possession did not embrace the 100 acres. In 1827, Mr Dickey rented the premises of Oliver Ormsby, and continued thereon till 1829, when James Patterson, one of the defendants, came into the possession.

On the 17th January 1804, Nathan Storkman obtained a vacating warrant, upon which he had a survey made of 411 acres 96 perches, including about 200 acres of the upper portion of the warrant of Joseph Williams. A patent was obtained thereon, dated 15th June 1804. That portion of the Storkman survey which lay above the Joseph Williams' tract, became vested in Oliver Ormsby, by a deed from Thomas Ross, dated 2d April 1816, calling it 210 acres and allowance, for the sum of $3200. That portion which lay within the Joseph Williams' survey, became vested in Oliver Ormsby, by deed from James Allison, Esq., dated 1st July 1829, calling it 200 acres, for $400. William Williams, the adverse settler, from whom Thomas Ross and Samuel Jackson derived their claim, conveyed to David Hoops and David Townsend 50 acres (the one-half of the 100 acres before mentioned) by deed, dated 8th June 1811; and David Townsend conveyed his interest therein to Oliver Ormsby by deed, dated 27th June 1820.

In the year 1829, James Patterson, one of the defendants, purchased (with other property) of Oliver Ormsby, the 800 acres, the tracts surveyed under the warrants of Joseph Williams and William Barker, mentioned in the contract between Brodhead and Hoops. By his deed, dated 3d July 1829, Oliver Ormsby conveyed to James Patterson, for the consideration of $30,000, the said two tracts of land, subject to the claim of Daniel Brodhead for the purchase money unpaid on the contract made with David Hoops, and subject to the legal claims of actual settlers on the land. After his purchase, James Patterson acquired the title of

[Gregg v. Patterson.]

the devisees of Daniel Brodhead to the warrant claims, and their heirs and alienees.  Daniel Brodhead died in the year 1809, after having made his last will, dated the 8th of August 1809, and proved before the register of Pike county November 1809, by which he devised the rest and residue of his estate to the children of his daughter, Ann Heiner.  Under this clause, it is thought, the warrants of Joseph Williams and William Barker passed.  The title of the devisees became vested in James Patterson at the following dates, and for the following sums of money:

By deed from Daniel B. Heiner, 5th Nov. 1831, $\frac{1}{4}$ part, for $750.00
"     "     "   George B. Brodhead, 10th Nov. 1831, $\frac{3}{7}$ths
                of $\frac{1}{4}$, for  -  -  -  -  -  -  321.42
"     "     "   Daniel W. Brodhead, *et al.*, 23d March
                1833, $\frac{4}{7}$ths of $\frac{1}{4}$, for  -  -  -  -  428.56
"     "     "   Charles S. Bradford, 25th Nov. 1835, $\frac{1}{2}$ part,
                for  -  -  -  -  -  -  -  1676.00
                                                    $3175.98
Deduct share of Henry R. Brodhead, a minor,  -  107.14
                                                    $3068.84

In these deeds it is recited, that James Patterson had become duly vested with the right and title of David Hoops, under the contract made by him with Daniel Brodhead, the testator, and that the grantors convey in pursuance of said contract.

On the 12th March 1831, James Patterson commenced an action of ejectment, No. 22, of April Term 1831, in the name of William Barker, for the tract surveyed on the warrant in that name, against Thomas Ross and others, the adverse settlers upon that tract.  This ejectment was prosecuted to verdict and judgment, 5th December 1834.  The expense of prosecuting this suit is estimated by James Allison, Esq. at $400.  After he came into the possession, Mr Patterson made extensive and valuable improvements upon these tracts, variously estimated by the witnesses at from $30,000 to $80,000.  The improvements were principally made after the year 1831, at different periods of time.  It was further known, that during this time the plaintiffs resided in and in the vicinity of the city of Pittsburgh, about 34 miles distant from the land in controversy.  The rents of the property were estimated as worth $700 per annum from the time Mr Patterson came into the possession till within four years of this time (June 1843); afterwards at $900 per annum.  Exclusive of Mr Patterson's improvement, the rents were worth $250 for the 100 acres of the upper tract, and $100 for the lower tract; the taxes to be deducted.

The defendants gave in evidence a deed of assignment by O. O. Gregg, one of the plaintiffs, and John G. B. Robinson, dated 7th July 1837, to John M'Fadden, in trust for the benefit of their

[Gregg v. Patterson.]

creditors, and proved that M'Fadden accepted the trust, and had acted upon it. Also, that the firm of Gregg and Robinson did not own real estate. Also, the application of Isaac Gregg, one of the plaintiffs, for the benefit of the insolvent laws, affirmed and subscribed to, 4th October 1840, in which the property in dispute was not returned. The petition was not prosecuted. A certificate of a decree of the District Court of the United States for the western district of Pennsylvania, declaring Oliver Ormsby Gregg a bankrupt, on the 22d August 1842, was given in evidence. Also another declaring Isaac Gregg a bankrupt, 15th August 1842. Samuel W. Black was appointed the assignee of each, who in December 1842 gave an authority to the plaintiff to prosecute this suit. The defendants further proved that Sidney T. Gregg was married to John G. B. Robinson in the year 1835; and that the said Robinson was still in full life.

On the part of the plaintiffs, James Allison, Esq. was called, who proved that he had been the counsel of Mr Patterson since he came to the county of Beaver, and was conversant with his titles, and that he had never known or heard of the fact that there was no judgment against Isaac Wilson and Isaac Gregg in the case of Carswell, until he was informed of it by one of the counsel of the plaintiffs in the year 1841; that until then, the sheriff's sale of Gregg's title had been conceived good by all parties, so far as he knew.

Upon the facts and circumstances thus given in evidence, the defendants submitted several points to the court for their instruction thereon to the jury; the first of which is, that the warrants and surveys for Brodhead conferred in Pennsylvania what is to be considered and treated for every purpose, as a legal title. The court answered this point in the affirmative. The second point is, if Mr Patterson obtained the title in the warrants and surveys before the institution of this suit, he has the right to avail himself of the title thus acquired against the equitable title, upon which the plaintiffs predicate their right to recover; and the plaintiffs, if not prevented by other causes from recovering, would not be entitled to recover until they do equity, by paying the one-half of the moneys advanced and paid by Mr Patterson in obtaining the legal title, and the one-half of the money expended in recovering the land from the adverse holders, and one-half of the amount expended by him, in good faith, in making substantial and valuable improvements. This second point the court also answered in the affirmative. The third point is, that if the jury believe Mr Patterson purchased in good faith what appeared to be a regular title, and made expensive and valuable improvements, and from 1827 (two years before the defendants purchased from Ormsby) the plaintiffs resided within 30 miles of the premises and continued so to reside till the present time, and during all that time gave no notice of their claim, they can have no equitable title to recover.

[Gregg v. Patterson.]

To this the court answered, if the jury believe that Mr Patterson purchased in good faith, what appeared to be a regular title, and that the plaintiffs had a knowledge of their title and permitted valuable improvements to be made, without giving any notice or intimation of their claim or title, this would prevent their recovery; but if they had no knowledge of their claim or title to the land, the improvements made would not prevent their recovery, and on doing equity by paying or offering to pay their reasonable part of the expenses in making the improvements, they would be entitled to recover.   The fourth point is, if one claiming the legal title under Brodhead, turned Ormsby and all others claiming adversely to the warrants out of possession, and Ormsby and his tenants took a lease, and thus acknowledged the title of Brodhead, which has since become vested in Patterson, Gregg's heirs, claiming under the equitable title, cannot be restored to the possession without tendering the money due on the article before bringing suit.   This point the court answered in the affirmative. It is unnecessary to notice the other points, as the answers to them, by the court, do not appear to be excepted to in the errors assigned.

The first matter complained of by the plaintiffs is, that the court, in their instruction to the jury, gave to the defendants an advantage from their having become invested with the legal title, as the defendants called it and the court seemed to consider it, that is not sanctioned or sustained by law; and further, that supposing Brodhead to have been the owner of the warrants, they did not invest him with such a title as the law requires, in order to distinguish it as a *legal* title, from what is technically denominated an *equitable* title; but the court seemed to think otherwise. Strictly and properly speaking, a warrant, though the purchase money of the land mentioned in it has been paid, is a mere authority to survey the land for the benefit of the warrantee, and not a grant by the State of the land itself.   The grant of the land is made afterwards by the execution of a deed on the part of the State to the warrantee, usually called a " patent," whereby the State devests herself of the *legal* title, which remains in her until then, and vests it in the warrantee or whoever may be the owner thereof at the time.   Yet the mere circumstance of having obtained a patent for land from the State gives no advantage to the patentee as against the warrantee entitled by law to it; and hence the warrantee, so entitled, may recover the land in an action of ejectment from a patentee under a junior warrant, or him who has improperly obtained a patent under the prior warrant belonging to the plaintiff.   And I cannot perceive, if Brodhead had obtained patents from the State for the lands, that it would have entitled him, his devisees or their assignee, to have claimed any advantage that they would not have been entitled to without such patents having been obtained.   Brodhead, although he contracted to sell and

[Gregg v. Patterson.]

convey the lands to David Hoops, was to retain the title he had for them, whatever it was, until he should receive one-half of the purchase money agreed on between them. He had only received $100 thereof; and although he had parted with the possession of the lands, and agreed that Hoops should take the possession of them, without paying any more of the purchase money, until Brodhead should well and sufficiently grant and convey them by such deed or deeds as the counsel of Hoops should reasonably advise and require, at the proper costs and charges of the said Hoops, which was to be done on or before the 1st of May then next following the date of the agreement (1st of May 1802); yet if Hoops failed in paying any more of the purchase money, and Brodhead was ready and willing to make such deed or deeds as were required by the agreement, it was lawful for Brodhead, his heirs, devisees or assignees, to claim and retake the possession of the lands by bringing an action of ejectment against Hoops, or any other in possession claiming from or under him. Ormsby was in possession under the right which Hoops acquired to it by his contract with Brodhead, and certainly was entitled to claim to be protected in it, in the same manner and to the same extent that Hoops would have been had he not parted with his interest in the contract made with Brodhead. Brodhead, his heirs or devisees, could only have turned him or Ormsby, who claimed under and from him, out of the possession, upon their failure to pay and secure the payment of the purchase money according to the terms of the contract.

But Ormsby, after the purchase money had become payable, was removed, as it would seem, from the possession by means of an ejectment brought after the death of Brodhead by those claiming as his representatives. This goes to show that there must have been a failure on the part of Hoops and those who succeeded to his right after he parted with it, to pay to Brodhead or his legal representatives the purchase money as it fell due, otherwise there could not have been, as we must take it, a recovery of the possession from Mr Ormsby. The representatives of Brodhead having recovered the possession of the lands by legal process, were entitled to hold it from Ormsby as well as all those who had gone before him, claiming from or under Hoops, until they were paid all arrearages of the purchase money due upon the contract made with Hoops. Mr James Patterson, one of the defendants, conceiving, as it would seem, that he had become invested with the entire interest in the lands which David Hoops acquired by his contract made with Brodhead, came forward to the representatives of Brodhead, claiming the benefit of the contract made with Hoops, and paid the balance of the purchase money, with the interest due thereon, amounting to $3175.98, with the exception, perhaps, of $107.14, coming to a minor, who was, therefore, incapable of releasing, as it was thought, his in-

[Gregg v. Patterson.]

terest in the title to the lands. But from all the other representatives he obtained deeds conveying and releasing their respective interests and rights to the lands. It is clear that the plaintiffs could not have recovered the possession from the representatives of Brodhead without having paid, or at least tendered the balance of the purchase money, with the interest due thereon. That right, however, which they had to hold the possession, they transferred to Mr Patterson upon being paid the amount thereof by him; then upon what principle of reason, equity or justice, can the plaintiffs claim to recover the possession of an undivided moiety of the lands, which they allege that they are entitled to, without first paying or tendering to Mr Patterson the one-half of what he paid upon the contract of Hoops? It must be admitted by all, that he has an indisputable right to be reimbursed by them the money which they would have been compelled to pay on account of their own interest, before they could have demanded and recovered possession of it. Justice, reason and common sense, seem to require that he should be protected in the possession of the moiety claimed by the plaintiffs, until they reimburse him the one-half of what he paid the representatives of Brodhead, in pursuance and performance of the contract made by Hoops for the purchase of the whole of the lands. Mr Patterson must be considered as having derived his present possession of the lands immediately from the representatives of Brodhead, and as being the same possession which they acquired by their recovery in the action of ejectment, instituted by them for that purpose; for he first got possession from Mr Ormsby, who obtained it by taking a lease of them, after he became liable to be removed by reason of their recovery, from that possession of the lands which he had derived from Hoops; and next by paying to the representatives the balance of the purchase money, he acquired their interest and possession as the lessors thereof. The case would have presented a different aspect if there had never been a recovery of the possession by Brodhead or his representatives, by means of legal process, and James Patterson had voluntarily paid the whole of the purchase money remaining unpaid upon the contract of Hoops. He, though in the possession of the whole of the land, could not have claimed to hold it to the exclusion of the plaintiffs until he was repaid by them the one-half of what he had paid. He doubtless, in such case, might recover it by suit, but he would have no right to hold and keep possession of the plaintiff's moiety of the land, as a pledge for the payment of it.

In *Bossler* v. *Neesly*, (2 *Serg. & Rawle* 352), though the facts are imperfectly stated, yet enough appears to show that the vendee of the land, having obtained possession thereof under his contract for the purchase of it, and after having paid part of the purchase money, died, whereupon the vendor took possession of the land without any legal proceeding, and without the consent of the heirs

[Gregg v. Patterson.]

of the vendee, who brought an action of ejectment against the tenant of the vendor, without tendering the balance of the purchase money, which had become payable; and held that they were entitled to recover the possession. The same principle was decided in *Harris* v. *Bell*, (10 *Serg. & Rawle* 39), where, by the articles of agreement, no time was fixed for the delivery of the possession of the house and lot contracted for, to the vendee; but before the day for payment of the purchase money, the vendee went into possession by the consent of the vendor, after the purchase money became payable, and a part of it remaining unpaid. The vendor obtained the possession by the act of a third person, who had no right to give it; it was held that the vendee or the heir of the vendee, the latter being dead, was entitled to recover the possession, without tendering the balance due of the purchase money, or bringing it into court. Also in *Vincent* v. *Huff*, (3 *Serg. & Rawle* 381), it was ruled, where A purchased the right of B to land, under an application and survey, that he is answerable to the Commonwealth for the purchase money, but was not bound to pay till called upon; and if the representatives of B obtain a patent, not at the request of A, or for his benefit, but for the purpose of vesting the title in themselves, A may recover in ejectment against them, or those claiming under them, without previously tendering the money expended in procuring the patent.

It is true that, in the case under consideration, the balance of the purchase money was paid by Mr Patterson, not with a view to secure the title to any portion of the property for the use or benefit of the plaintiffs, but for the purpose of securing the title to the whole of it for himself; and no doubt honestly too, but negligently; for it would seem that he purchased the whole of it from Ormsby, and paid a full price for it, and rested under a complete conviction that he was vested with all the right and interest which the plaintiffs or their ancestor, Mr Isaac Gregg, ever had in or to the property. In this, however, he was clearly mistaken; for the sheriff's sale caused to be made by Mr Jeremiah Barker, though it embraced the whole, did not affect the rights of the plaintiffs to it, or devest them of the same. For there was no judgment against Mr Gregg or his representatives, or against Isaac Wilson, under which such a sale could be made; and it was, therefore, as regarded the interest of the plaintiffs in the property, a nullity. And besides, the purchase money paid by Mr Patterson had become payable long before, and had actually been called for and demanded, so that the payment of it could not be properly said to be voluntary, as in the case of *Vincent* v. *Huff*. We also think that Mr Patterson is entitled to be repaid the one-half of the amount of all the expenses which attended the recovery of the possession of that portion of the lands from those who held it, and claimed to be entitled to it under an actual settlement, vacating warrant and patent founded thereon. But as it was almost if not altoge-

[Gregg v. Patterson.]

ther impossible for the plaintiffs to ascertain what these expenses were or ought to be, we do not think that they were bound to have paid or tendered the one-half thereof before instituting this suit, as they were in the case of the one-half of the balance of the purchase money. It may be sufficient, on the trial of the cause, to have the one-half of the amount of those expenses ascertained by the jury, if the parties cannot agree on the same; and the court can stay execution of the judgment in case it shall be for the plaintiffs, until the one-half of such expenses shall be paid.

But that part of the answer given by the court to the defendants' second point, whereby the jury were instructed that the plaintiffs could not recover until one-half of all that was expended in good faith by the defendants in making substantial and valuable improvements, were paid by them to the defendants, in our opinion cannot be sustained. This instruction of the court below we think is clearly erroneous. If such a principle were to be sanctioned, it would put it in the power of any one who got into the possession of land under the belief that he had a good title to it, to improve the real owner, in effect, out of all right and claim to it, by expending money and labour in the erection of buildings, and in making other improvements thereon, beyond what all were worth when perfected. This idea, however, has ever been repudiated, and cannot be maintained under any circumstances, unless, perhaps, where the owner, having a full knowledge of his right, stands by, seeing the improvements as they are being made, without making known his right or claim to the ownership of the land, when he has reason to believe that the improver is ignorant of it, and considers himself the real owner thereof. It is true as between tenants in common, or joint tenants of a house or mill which falls into decay, and the one is willing to repair the same, but the other is not, he that is willing shall have a writ *de reparatione faciendâ;* and the writ saith *ad reparationem et sustentationem ejusdem domus tenetur;* whereby it appeareth, as Sir Edward COKE saith, that owners are, in *that case,* bound *pro bono publico* to maintain houses and mills which are for the use and habitation of men. *Co. Lit.* 200 *b,* 54 *b; Fitz. N. B.* 127. But it is only to houses and mills already erected and in being, that this right extends, even as between tenants in common or joint tenants, and not to wood land or arable land, for there the one has no remedy against the other to make enclosure or reparations for safeguard of the wood or corn. *Bowles' Case,* 11 *Co.* 82 *b.* And it may be that a tenant in common or joint tenant who repairs a house or mill held by him in common or jointly with another, after a refusal by the latter to join in making necessary and suitable repairs, might recover in an action on the case one-half of the expense incurred in making the repairs. But the writ *de reparatione faciendâ* never was extended to such as were strangers to each other in regard to holding *houses* or *mills* where each claimed exclusively

[Gregg v. Patterson.]

the right to the whole; and never in any case to the building of new houses or mills upon lands; not even as between tenants in common or joint tenants.   So that the claim of Mr Patterson and the other defendants in this case to be reimbursed by the plaintiffs the one-half of the moneys and labour expended in making substantial and valuable improvements, whether they consist of houses, mills, or any other description of improvements, is entirely out of the question; for they have not even the shadow or colour of claim to be reimbursed the same, though they may have made them all in good faith, and under the conviction that they were the only owners of the land, at the time, on which they were made.

The answer of the court to the third point of the defendants has just been shown to be erroneous, so far as it affirms that the plaintiffs cannot recover, though their title otherwise be good, without paying first the one-half of the expense incurred by the defendants in making the improvement, if it was believed by them that Mr Patterson had a good title to the land in question.   And the circumstance of the plaintiffs residing within 30 miles of the property, from 1827 to the time of trial, was wholly immaterial, if they were ignorant of their right and title to an undivided moiety of it.   There is no evidence going to show that they came to the knowledge that they were not devested of all their right to the property by the sheriff's sale, until shortly before the institution of this action; and that until then they were quite as ignorant of it as Mr Patterson or any other of the defendants.  But it would seem as if there was less excuse for Mr Patterson being ignorant of the plaintiffs' right than there was for the plaintiffs themselves. Mr Patterson having purchased the property and paid a full price for it, must be presumed to have seen and examined the title which he got of Mr Ormsby for it, or if he did not, it was a great neglect on his part.  *Caveat emptor* is the maxim in such case.  And certainly if he had examined into the title, as he ought to have done, he would have seen that the levy and sale of the property made by the sheriff was made under a judgment against Jeremiah Barker alone, and not upon a judgment, as recited in the writs of *fieri facias* and *venditioni exponas*, against Isaac Gregg, the father of the plaintiffs, and Isaac Wilson in conjunction with Jeremiah Barker; and seeing this fact, he was bound to know that in law the sale was void as to Isaac Gregg's right and interest in the premises purchased by him and those vested in his heirs; for the maxim of law in this respect is, *ignorantia legis neminem excusat.*  The plaintiffs were young and inexperienced in business at the time the property was sold by the sheriff; and as the settlement of their father's estate had been undertaken by their mother and their uncle, her brother, to whom the administration of it had been granted by the register, it was natural for them to suppose and believe that everything done under their inspection and with their knowledge would be and was done rightly.   So that it is

[Gregg v. Patterson.]

not at all surprising that many years should have elapsed after the sheriff's sale before they came to a knowledge of the fatal defect in it as to their interest in the property. There does not, therefore, appear to be the least ground for raising an objection to their claim on the ground of delay, either in law or equity.

In regard to the fourth point submitted by the defendants, which was answered in the affirmative by the court, enough has been said on the points already noticed to show that we consider the answer to the fourth point correct, and that there is no error in it. But having shown that the court erred in matters embraced in the preceding points, the judgment is reversed, and a *venire de novo* awarded.

Judgment reversed, and *venire de novo* awarded.