# Bunting *against* Young.

Where warrants were obtained from the Commonwealth in 1793, on which the purchase money was paid at the time, surveys made in the next month, embracing the land in dispute and returned into the Land Office and accepted in February 1794, there can be no such thing as abandonment by which the title can be lost; and if there be nothing else on the subject, it is error to leave it to the jury to say whether there has been an abandonment or not.

The doctrine in *Foust* v. *Ross*, (1 *Watts & Serg.* 506), explained and applied to the case of a title under a sale for taxes.

The admission of evidence in the court below, by which the plaintiff in error could sustain no prejudice, is not material.

THIS was an ejectment brought in the Common Pleas of *Northampton* county to January term 1841, by Jacob T. Bunting against Reuben Young, Samuel Doak, and George Zeiegenfuss, impleaded with Daniel Bickel, in which a verdict and judgment were rendered in favour of the defendants below.

The plaintiff gave in evidence a warrant for 400 acres to Isaac Kreider, dated the 2d August 1793; also a survey in pursuance of said warrant for $466\frac{1}{2}$ acres, made on the 25th September 1793 and returned the 20th February 1794.   On the 23d January 1832, a patent was granted for the land thus warranted and surveyed, to Wharton Newbold, Benj. Kugler, Shober & Bunting.   On the 28th January 1839, the patentees conveyed by deed to John B. Shober, and on the 24th April 1840 he conveyed to the plaintiff.   Also a warrant for 400 acres to James Santee, dated the 2d August 1793, on which a survey of $450\frac{1}{4}$ was made on the 25th September 1793, which was returned on the 20th July 1794; and on

[Bunting v. Young.]

the 23d January 1832, a patent was issued to the above-named patentees and by deeds of the above-named parties, and of the same dates, the title was conveyed to the plaintiff.

The defendants gave in evidence a warrant to Bartel Hittle for 400 acres, dated the 13th May 1786, and a certified copy of survey dated the 17th December 1802, of 434 acres. This survey purported to have been made by order of the Board of Property, dated the 2d April 1798. On the 21st December 1802, a patent was granted in pursuance of said warrant and survey to George Blank and Michael Harlacher. They also gave in evidence a warrant to Philip Schrœder dated the 13th May 1786, survey of 400 acres made the 12th June 1787, returned the 9th December 1802, and patent to Blank and Harlacher the 22d December 1802 : also a warrant to Jacob Ernhart, dated the 13th May 1786, survey and return of 262 acres, as in the Bartle Hittle warrant; and patent 22d December 1802, to Blank and Harlacher.

- The defendants also gave in evidence receipts for the purchase money due the Commonwealth the 15th May 1786; also a receipt to Blank and Harlacher for the balance due the State on these their warrants of £2 10s., dated the 14th December 1802 : a deed poll from Philip Schrœder, dated the 24th August 1786, to Michael Schrœder : a deed poll to the same by Bartle Hittle, dated the 24th September 1790 : a deed poll to the same by Jacob Ernhart, dated the 24th August 1786. The title of Michael Schrœder was vested in Blank and Harlacher by deed dated the 29th August 1801. They also gave in evidence the deed given by Blank and Harlacher to Bickel, Moore, Gangwer and Christman, dated the 12th October 1832, and the deed of Moore and wife and Christman and wife, to Bickel, dated the 3d June 1840.

On the 12th July 1796, a caveat was entered against the plaintiff's right, when the person entering the caveat had leave to withdraw it, and got an order of survey on the 2d April 1798.

The defendants gave some evidence of the payment of taxes at different times for these lands, which were of no importance, except to show that they had paid some attention to them and claimed them.

The notes of the testimony of Jacob Hartz, as taken on the former trial, were read by consent. He testified that he built a saw-mill on this land in 1818, cleared a garden ; that he was on the land two years ; that he cut timber on the land; that the saw-mill was on the Hittle tract; that Washburn was on the land before him, and had a house and raised wheat. James Washburn testified that he knew these lands 36 years ago; that he lived on the land six years. His father began the work on the land. They were on it six years. They went on in 1805, cleared five acres, and raised grain of all kinds, made shingles. All was done under and at the instance of Blank and Harlacher. Michael Young testified that he had known the land 36 years; Washburn then

[Bunting v. Young.]

lived on it; he cut grain on it in 1805.   Hartz moved on next. Moore moved on after Hartz moved away.   Old mill then down, and he built a new one.

The plaintiff called Mr Lowry, who testified that he had known the land since 1823; knew of no buildings but the saw-mill built by Hartz; Hartz said his lease was out, but they would not let him lease it any longer; saw no farming on it.   Also, Miller Hodge, who said he ran the lines, and the mill was not on the plaintiff's claim; he was chain-carrier.

The plaintiff gave in evidence the deeds of the treasurer, dated the 11th June 1838, for the sales of the Kreider and Santee tracts as unseated for the taxes of 1836–7; surplus bonds same date, filed the 19th January 1839.   The assessment was shown for the year 1836–7, and these two tracts were charged as unseated.

The defendants then gave in evidence the seated duplicate for the years 1832–3–4–5–6 and 7, 1100 acres and saw-mill, charged as seated to Moore for those years.   It was also shown that Moore was not exonerated from the payment of said taxes.

During the trial, three bills of exception were taken by the plaintiff to the admission by the court of evidence offered by the defendants.   1. The proceedings of the Board of Property on the 12th of July 1796, on a caveat that had been entered by Michael Shrœder against granting patents to James Santee and Daniel Smith, on their two warrants dated 2d August 1793, permitting the caveat to be withdrawn, and directing the deputy-surveyor to execute his two warrants in the name of Jacob Ernhardt and Bartle Hittle, dated the 13th of May 1786.   2. A receipt by John Fogel for Moses Cohen, supervisor, to John Harlacher, for $5.15 for road taxes for 1823 and 1824.   3. Deeds poll from Bartle Hittle, Philip Shrœder, and Jacob Ernhardt, to Michael Shrœder, in the years 1786 and 1790, and deed 29th of August 1802, from Michael Shrœder to Geo. Blank and Michael Harlacher, for three warrants, not recorded.

The plaintiff requested the court to charge as follows:

1. That no one of the defendants' warrants in this case is precisely descriptive; but, whether precisely descriptive or not, if not followed up with due diligence by having the same executed and the same returned into the surveyor-general's office, they must yield to a subsequent warrant so executed and the survey returned.

2. That the neglect of a warrant-holder to have his warrant executed and the survey returned for seven years, where he has not taken possession of the land or done some act equivalent thereto, will postpone his claim to that of a subsequent warrantee, who has his warrant executed and his survey returned, within six months after obtaining the same, and before the first warrantee has had his warrant executed and the survey returned.

[Bunting v. Young.]

The court below (BANKS, President) charged the jury as follows:

As to the tax title, as shown by the plaintiff, his counsel do not rely upon it. How could they with much hope of success? for if the defendants had these lands entered as seated, and paid the taxes, and the land was in fact seated, their title would not be devested by an assessment and sale of the same lands for the same years, made either in their names or in the names of others. On this part of the case, the evidence was such as to induce the plaintiff's counsel to say that they did not rely on their tax titles. This makes it unnecessary to say more on this part of the case to you; nor need you give yourselves any trouble about it, as it is conceded that it gives the plaintiff no title.

By reference to dates, it will be seen that the defendants' warrants are the oldest. But on the Hittle and Ernhardt warrants we have no evidence that surveys were made before the 2d of April 1798. I presume the surveys which have been given in evidence were made between that time and the 17th of December 1802. There is no evidence that any other survey was made on these warrants. These warrants were not descriptive. They might have been applied to other lands with as much propriety as these. Therefore, as the plaintiff's warrants were first applied to the lands, they would give the better right. On the Schrœder warrant a survey was made on the 12th of June 1787, which was not returned until the 9th of December 1802. Inasmuch, therefore, as this survey was not returned within seven years, the right under the warrant and survey would not be good against the intervening right under the plaintiff's warrant. Thus, considering the warrants and surveys merely, the plaintiff would be entitled to a verdict for that part of the lands in dispute, and claimed in this suit.

The defendants rely on the statute of limitation. This defence cannot avail them. They have not had that continual possession for twenty-one years which is necessary to make a right under the statute. Washburn went on the land in 1805, and continued for six years. Hartz went on in 1811, and continued on for two years. Moore went into possession after 1830. This possession is altogether insufficient. Nor is it helped by proof of payment of taxes; neither sufficiently makes out the necessary possession; nor will they, when united, justify the presumption of an ouster, so as to give the defendants the benefit of the statute of limitations.

Although the plaintiff's warrants and surveys were at one time the best title, was that title abandoned, or did it become derelict by the lapse of time during which the owners of the warrants omitted to look after the lands and pay the taxes, or assert any act of ownership over them? On the decision of this point the title must rest. This is a question for your decision. It is left to you with the remarks which I shall proceed to make. This question of the abandonment of a warrant, with purchase money paid to

[Bunting v. Young.]

the State and survey made and returned, is partly new to me.  I would require strong and satisfactory proof to justify such a conclusion.  I therefore lay down to you as the law, that the proof of abandonment must be satisfactorily made out before you can find against the plaintiff on that ground.  In the consideration and determination of this question, you will weigh with care all the facts and circumstances of the case.

A warrant and survey and return are a legal title.  Lands are held and conveyed by them as such.  Dower and curtesy are incident to them as of legal estates.  They descend as legal estates.  By virtue of these, recoveries may be had in courts of law as well as equity.  Notwithstanding this may all be true, still something remains to be done by the warrant-holder.  Although the warrant confers upon him a legal right of entry and vests in him an estate that is good both in law and equity, the legal title remains in the State.  In many cases more land is included in the survey than is called for in the warrant.  In such cases the State in addition to the legal title would have a valid claim for the price of the excess.  The contract between a warrantee and the State, is executed but in part: it wants the ultimate confirmation of a patent, and as to this is still executory.  I have said that this doctrine of abandonment as to warrants, and surveys returned, is in some degree new to me.  I had looked upon the warrant and survey as completely separating the appropriated ground from the other lands of the State, as if there had been a grant by patent.  I do not speak of warrants, which are to be accompanied with settlements.  Before a survey is returned it may be altered, and indeed laid on other lands by the direction of the owner; after return it cannot be done, without an order of the Board of Property.  In neither can it be done, to the prejudice of intervening rights.  When it is done, it is but the abandonment of the survey by the express act and direction of the owner.  That surveyed land is forfeited if not returned in a limited time, is a recognition of this doctrine of abandonment.  If the owner may abandon his survey by not returning it in proper time, why may he not do so, after return, by acts that are sufficiently unequivocal?  A settlement may be abandoned; so with an application and warrant.  These are but single cases to which the doctrine has been applied.  It might be applied to other cases with equal propriety, for it is but a penalty for not proceeding to complete a title, exacted in favour of another who has a superior equity.  Lands while the title remains in the State are not to be locked up by one who pays no attention to them, and declines to bear his part of the burthen common to every member of society, as the owner of property.  By law a man is left at liberty to forfeit his title, or in some cases to lose it, for neglect.  He who has made some advances towards acquiring a right, may abandon or relinquish it.  Why may not this be done after return of survey, as well as before?  In the one case

the land is paid for as well as the other. The same trouble and expense of making survey exists in each case. The office of the deputy-surveyor, with the work on the ground, give the same evidence of survey in each case. Why not make the doctrine of abandonment applicable to the one as well as to the other? I do not feel bound to search out reasons why it should, as the affirmative of the proposition finds countenance if not direct authority in the case of *Foust* v. *Ross*, (1 *Watts & Serg.* 506). In that case the right of Mary Custard under a warrant dated the 30th of August 1792, was invoked by one of the parties as a valid, subsisting outstanding title. On this warrant there had been survey made and returned. The question was as to the validity of title under this warrant, survey and return. To this title the doctrine of abandonment was applied by the court in its broadest terms. The Supreme Court in their opinion said, that the party resisting the title under this warrant might do it successfully, by showing what would amount to abandonment. That not looking after the lands or paying taxes for 21 years, may be sufficient evidence of this. This case I look upon as an express decision on the very point. The plaintiff relies on a tax title; this tax title was not valid. The defendant showed no title, but rested his case on this Mary Custard warrant, as an outstanding title. The plaintiff gave no evidence to defeat its original validity. Abandonment was the only argument used against it. The defendant, though a mere trespasser upon the rights of some one, might rest his case upon it.

The plaintiff must recover on the strength of his own title. On this state of facts the law was laid down as I have read you from the book. That was no doubt a strong case in favour of the doctrine of abandonment. It is not the case we are looking after, it is the principle. Does the principle exist, as matter of law, on a proper state of the facts? This is apart from the evidence being strong or weak. The principle of law is what we are called upon to declare to you; whether the facts make out the case is another consideration. On the authority of this case I feel bound to charge you that a warrant and survey returned may be abandoned by the owner. Are the facts then such as to warrant you in deciding that the title under the plaintiff's warrant and returned survey had been abandoned by the owner, or become derelict? The decision of this question is left to you. The warrants are dated in 1793, and the surveys were made in the same year, and were returned in 1794. Nothing further was done until the 23d of January 1832, a period of 38 years, and about 30 years after the emanation of the defendants' patents. You will take into consideration all the facts and circumstances on both sides. That the defendants' warrants were the oldest, as I have already said, does not make them in this case the better title; nor are you to consider their bearing on that point, but on the question of abandonment. You will also on the same question consider the

entry of the caveat, and the order of survey and the issuing of the defendants' patents, in 1802. The owner of the plaintiff's warrants may have considered his right doubtful. On that account he may not have thought it worth while to contend for it, or prudent even to expend his money in the payment of taxes. How can you account for this long delay? The defendants had their survey and patent. They at times had possession of the land. These things might have been known by the owner of the plaintiff's right. If he had attended to his lands, he must have known them. In the face of these facts, is it not probable that he would have come forward at an earlier period to make good his claim, if it had not been abandoned by him? If you are satisfied that he had abandoned these lands, it would not be endured that now, after all this delay, this confirmation of title, the *bonâ fide* purchase, payment of money, and making improvements by the defendants, the plaintiff should successfully revive this old claim, because that the lands may have acquired a value by reason of the improvements being made near to them, which they originally did not possess. We then leave it to you to decide whether the plaintiff's title has been abandoned or not. If you are satisfied from the evidence that it has, then your verdict will be for the defendants. If you are not satisfied that it has, then your verdict will be for the defendants. The court charges as requested in the plaintiff's points.

The plaintiff excepted to the charge.

Errors assigned:

1. The court erred as stated in the several bills of exceptions.

2. In all they said respecting an abandonment by the plaintiff.

*Maxwell*, for the plaintiff in error.

*King*, contra.

The opinion of the Court was delivered by

KENNEDY, J.—It is unnecessary to pass an opinion upon the bills of exception to the admission of evidence, as no injury or detriment whatever could have accrued to the plaintiff from it. For, according to the instruction given by the court to the jury, it had no concern with, or relation to the ground on which the court charged erroneously against him. The court expressly told the jury that the plaintiff's title to the land in question was originally the best, and was so still, unless the jury should be of opinion that it had been abandoned by him, or those through whom he claimed. So that the evidence admitted and excepted to, having no relation or bearing whatever upon the fact or notion of abandonment, could not have prejudiced the plaintiff in the slightest possible degree.

But the instruction of the court to the jury in regard to the plaintiff's having abandoned his prior and better right to the land,

is what we think he has just ground to complain of; and that the court erred in leaving it to the jury to say whether, under the circumstances and facts given in evidence, the plaintiff, or those from whom he derived his claim to the land in question, had not abandoned their right and title to it. The title under which the plaintiff claimed the land, consisted of warrants obtained from the Land Office in August 1793, upon which the purchase money was paid to the Commonwealth at the time, surveys made thereon in the next succeeding month, embracing the land in dispute, which were returned into the Land Office, and accepted there in the month of February of the following year, whereby the contract for the sale and purchase of all the land included within the surveys, of which the land in controversy formed a part, became complete and binding upon the warrantees, as well as the Commonwealth; so that neither the one or the other, without mutual consent, could annul or rescind or undo what had been done in pursuance of it, not even so as to change or shift the warrants to any other land. The Commonwealth became bound to perfect the title to the warrantees for the land so surveyed, upon their paying the patenting fees and the purchase money for the excess of land contained in the surveys, beyond the quantity mentioned in the warrants. And the warrantees, on the other hand, became bound to pay for such excess and the patenting fees, which the Commonwealth had the power of enforcing whenever she pleased. Until the survey made in pursuance of a warrant shall have been returned into the Land Office, the warrantee may change the location of it, by shifting and having it made upon other land remaining unappropriated, and thus abandon his first survey, and all claim to the land embraced within it. Having such right to change the location of his survey at any time before it shall have been returned by the deputy-surveyor, it would seem to be not only reasonable, but necessary, on grounds of expediency and good policy, that he should be required to pay the deputy-surveyor, who has made the survey, his fees for so doing, within a reasonable time, so as to make it the duty of the latter to return the survey into the surveyor-general's office; or otherwise he, although he may have no idea of abandoning his survey or claim to the land included in it, may lose it, by even a junior warrantee getting it surveyed and returned under his warrant. For it is manifest that it would be unjust, as regards the interest of the Commonwealth, that the owner of the senior warrant, or warrants under which the first survey has been made, should be permitted, in such case, by withholding the return of his survey for any unreasonable length of time, to keep the Commonwealth in a state of suspense as to whether he will take the land actually surveyed under his warrant or not; and finally, if he concludes not to take it, and has a second survey made on and returned for other unappropriated land, he may possibly prevent the Commonwealth from selling the land embraced in the first survey, or

at least cause great delay in her doing so. In order, therefore, that the Commonwealth may not be prejudiced by the neglect of the party, in such case, to have his survey returned within a reasonable time, it is right upon principles of sound policy, as also those of justice, that, after such reasonable time has elapsed, without any return of the survey having been made, owing to the neglect or will of the party for whom it was made, the Commonwealth should have the right to dispose of the land again to the first applicant, or that any prior or subsequent warrantee should be at liberty to appropriate it, by having a survey made upon it under his warrant; and that the party for whom the first survey was made shall be presumed to have abandoned it, whether he actually intended to do so or not. That such presumption is founded in reason, cannot, I think, be denied. But it is likewise founded upon what may be considered natural, or at least cannot be said to be unnatural, and may be consistent with ordinary motives of human action. For the party may have discovered unappropriated land lying elsewhere, preferable, in his estimation, to that included in his survey, which he has it in his power to secure as long as his survey remains unreturned. But after having returned his survey, he is bound by it, and cannot take other land, so that all possible ground for presumption of abandonment is out of the question, for he cannot then abandon his right to the land without abandoning his right also to the warrant, and losing the purchase money which he has paid the Commonwealth for it. That he would do this, cannot well be presumed, because it is contrary to the common incentives which generally govern and influence all mankind, that any one should be so regardless of his pecuniary interest. The plaintiff then, in this case, having had his surveys returned, and having thereby acquired an absolute and indefeasible title to the land in question, could not give it up, or abandon it, with any possible prospect of being able to remunerate or indemnify himself for the loss. Abandonment, therefore, must be considered as being wholly out of the case.

Had an actual possession, adverse to the plaintiff's right, been taken by the defendants, or those from whom they claim, of the land in dispute, and kept by them continuously for twenty-one years, without anything being done during that period to put an end to it, the plaintiff might have lost his right, not by abandonment, however, but by the operation of a positive enactment of the Legislature. The statute of limitations, as it is called, would doubtless have interposed, and not only have protected the defendants in their possession, but have given them a right to the land. This, however, as it would appear from the evidence, does not seem to have been the case. The subject of abandonment is very fully discussed, and all the authorities bearing on it referred to, in *Adams* v. *Jackson*, (4 *Watts & Serg.* 74 *et seq.*). From which it will be seen that no abandonment can take place of such a title to

[Bunting v. Young.]

land as exists on the part of the plaintiff in the present case. The case of *Foust* v. *Ross*, (1 *Watts & Serg.* 506), cited and relied on by the court as authorizing it to submit the question of abandonment by the plaintiff of his title to the jury, was never intended to be applied to such a case as the present. There the plaintiff claimed the land in dispute by virtue of the only warrant and survey that ever appeared to have been applied to it, and a sale made of the same by the sheriff of the county under a warrant of the county commissioners, for and on account of taxes remaining unpaid, which had been assessed upon it as unseated land anterior to the passage of the Act of 1815. The defendant did not pretend that he had any title to the land, but objected to the regularity of the sale made of it for taxes, under which the plaintiff claimed, alleging that the sale was void, inasmuch as it had not been shown to have been made in exact conformity to the Acts of Assembly in force on the subject, prior to the Act of 1815. The court, however, held that it was not competent for an intruder upon the land, who was a stranger to the only title shown for it, without any authority from the warrantee, to contest the validity of the sale made on account of taxes. The warrantee or owner of the land at the time of the sale, had an unquestionable right to waive all objections to the irregularities of it; and if he did so, the right of the purchaser thereby became good and indefeasible. And where the warrantee or owner of unseated land, after an irregular sale made of it on account of taxes in arrear upon it, lies by for twenty-one years, without making any claim to it by paying the taxes assessed, or exercising acts of ownership on it, but suffers the purchaser, his heirs or assigns, at the tax sale, to pay the taxes assessed during that period, it may fairly be presumed that he has waived his right to object to the sale; or, in other words, as was said in *Foust* v. *Ross*, that he has abandoned his right to the land in favour of the purchaser at the tax sale. And whenever he does so relinquish his right to the land, he becomes entitled to receive the surplus money arising from the sale, after paying the taxes and costs out of it, so that he may be said to have some consideration, if not an adequate one, for doing so. Nothing beyond this was decided in *Foust* v. *Ross*, which does not furnish even the least shadow of ground for saying that the owner of land, holding it under a warrant and survey returned, can be said to have abandoned his right to it, where no sale has been made of it for taxes or other legitimate purpose, or adverse possession been taken of it and held continuously for twenty-one years at least, though forty years or more may have passed by without his taking actual possession of it, or exercising acts of ownership upon it.

Judgment reversed, and a *venire de novo* awarded.