## JOHN E. PUTNAM v. PHŒBE TYLER.

ERROR TO THE COURT OF COMMON PLEAS OF CLEARFIELD COUNTY.

Argued May 6, 1887—Decided January 3, 1888.

1. Where in an assessment of unseated land for taxes, the tract is described by its proper number in the name of the original warrantee, and so designated as to lead the owner to a knowledge that it is his land which is assessed, a tax sale thereof is valid, notwithstanding a misstatement of the number of acres contained.

2. An outstanding title acquired from a purchaser at a valid tax sale, of record, and unaffected by circumstances raising an estoppel or by the

statute of limitations, is an available protection to a defendant's possession in an action of ejectment.

3. When there is neither estoppel nor limitation, there can be no abandonment, no matter how formal the act, short of a conveyance, which can affect the holder of a perfect legal title.

4. One who by positive acts has induced another to purchase land of which he is himself the true owner, is thereafter estopped from setting up his title against the purchaser, even though he acted in good faith and in ignorance of his own rights.

5. In an action of ejectment, a defendant who was a bona fide occupant under claim of title, and, believing himself the true owner, had made valuable improvements in betterment of the estate, is not entitled to be secured the value thereof before being obliged to surrender.

Before MERCUR, C. J., GORDON, TRUNKEY, STERRETT, GREEN and CLARK, JJ.; PAXSON, J., absent.

No. 290 January Term 1882, Sup. Ct.; court below, No. 275 January Term 1882, C. P.

On December 5, 1881, Phœbe Tyler brought an action of ejectment against John E. Putnam to recover a lot of ground containing about one third of an acre, with a dwelling house and other improvements thereon. A like suit was brought by the same plaintiff against Charles W. Scates, for another lot of like size, and with like improvements. The facts of both cases being the same, they were tried together in the court below and argued together in this court.

On the trial, September 28, 1886, one ground of defence was an outstanding title to the lots in Jones, Warner & Andrews, claimed to be as follows:

Tract 4897 was surveyed under warrant in 1794, on Bennett's Branch of the Sinnemahoning creek, and contained 990 acres and allowance. The location was made over an older survey, the James Hutchinson, made in 1785, and which occupied the whole of the land in 4897 except the northwest corner, containing about 100 acres, and the southwest corner, containing about 135 acrces. In 1826 and 1827, tract 4897, in the name of Wilhelm Willink, was assessed in the unseated list as 100 acres. The taxes being unpaid it was sold by the treasurer of Clearfield county, and by him conveyed to Ebenezer Hewitt, who on July 26, 1836, conveyed his title to Jones, Warner & Andrews. The two deeds were duly recorded on August 11, 1836.

Charge of Court below.

But it was claimed by the plaintiff: That by sundry conveyances in evidence the title to 4897 had become vested in 1812 in William Coxe, who conveyed on September 10, 1816, to Alexander Boyd, recorded; that on September 30, 1819, Alexander Boyd conveyed to Martin Nichols 750 acres of the west part of 4897, which included most of the parcel claimed by Phœbe Tyler as 36 acres and the lots in controversy so far as they were within the 36 acres ; that on February 26, 1820, said Alexander Boyd conveyed to Jonathan Nichols 300 acres, residue of 4897, who on July 25, 1823, conveyed to John Macomber; that on March 9, 1853, Martin Nichols conveyed to David Tyler 100 acres in northwest corner of 4897 and 36 acres more or less in said survey on the south, described as the same parcel conveyed by Ebenezer Hewitt, recorded June 24, 1854; and that on September 9, 1881, David Tyler conveyed to Phœbe Tyler the parcel described as 36 acres more or less in the southeast corner of 4897, bought from Martin Nichols.

It was also claimed by the defendants that the plaintiff was estopped by the conduct of David Tyler, her grantor. The facts out of which this estoppel was alleged to arise appear in the charge of the court below and in the opinion of this court.

The court, JOHN DEAN, P. J., charged the jury as follows:

The issues you are sworn to try are two ejectments for two lots of ground each 70x170 feet, at Tyler's station, Huston township, in this county. The plaintiff in both actions is Phœbe Tyler; the defendant in one case is J. E. Putnam and in the other is Charles W. Scates. Scates, and those in possession with him, hold their title under J. E. Putnam. [The two lots are part of a piece containing 36 acres, more or less]⁴ which 36 acres formed part of a tract containing 990 acres and allowance, originally warranted February 3, 1794, to Wilhelm Willink and others, associated as the "Holland Land Co." The tract was numbered, under the system of granting lands at that date in that part of the commonwealth, No. 4897. It was surveyed on February 18, 1794, and patented July 23, 1800, to Isaac Wharton, David Lewis and others. The title to the land embraced in this patent by regular conveyances through a number of parties down to February 20, 1820, became vested in one Martin Nichols, who on March 9, 1853, conveyed 100 acres of it, and 36 acres of it, to David Tyler.

It appears that the 990 acres surveyed on the warrant to the Holland Land Co. had with the exception of this 100 acres, and 36 acres, been appropriated under an older warrant dated in 1785, and leaving vacant for appropriation under this warrant, when the survey was made in 1794, only the 100 acres, and the 36 acres. On June 1, 1869, David Tyler executed a mortgage on that part of the land conveyed to him by Martin Nichols on March 9, 1853, to William A. Wallace, to secure a loan. A scire facias was issued on this mortgage, judgment obtained, and the land described in it sold to A. H. Dill on February 9, 1872, and a deed acknowledged. It is admitted by both sides that the mortgaged premises did not include the 36 acres, nor the land in dispute; [and afterwards, on September 9, 1881, David Tyler by deed duly executed and delivered, conveyed the 36 acres embracing this land in dispute in these two lots to this plaintiff, his daughter, Phœbe Tyler.][5]

[Unquestionably, on the undisputed evidence in the case, this plaintiff, Phœbe Tyler, has a legal title to the 36 acres, and is entitled to the possession of it, unless there be that in the evidence which in equity will estop her from asserting her claim against these defendants, Putman and Scates.][6]

The defendants allege that John E. Putnam, one of the defendants, and under whom they are claiming, by the representations of David Tyler, the grantor to Phœbe Tyler, was induced to believe that the real title was not in him (Tyler) but in another, and that acting on these representations he (Putnam) took a conveyance from the devisees of Wm. Coxe who was formerly an owner of this land; that he (Putnam) then took possession and made considerable improvements on these lots, the improvements costing several thousand dollars; that Tyler having knowledge of this, standing by and seeing him (Putnam) expending his money, never notified him of his claim, and then after the money had been expended and the property made very valuable by reason of the improvements Tyler's grantee, Phœbe Tyler, sets up this conveyance and brings an ejectment.

The defendants allege that the plaintiff (grantee) and David Tyler, the grantor to this plaintiff, she holding or claiming title through her father, are in equity estopped from asserting title to the land. One who has title to land, yet induces

another to believe that he has not title but that it is in another, thereby encouraging the party and deceiving him as to the title, is estopped from setting up his title against the party he has deceived.  If it were permitted, it would be a fraud upon the party misled.  Again, if one having title to land, stands by and sees another put up valuable improvements upon his land, the party putting up the improvements believing he has a right so to do, the mere silence of the real owner is a fraud upon the party who thus expends his money.  It is his duty to speak when he sees his neighbor expending his money under a mistake or misapprehension as to title.  Legally he owes his neighbor no such duty if he sees his neighbor expending money upon another's land.  No matter what the mistaken belief may be, inducing the conduct of a neighbor, if it is on another's land legally he owes him no duty.  But if he sees him making valuable improvements upon his own land, it becomes his duty to speak; he must tell his neighbor of his mistake, if it is a mistake, and he is to profit by the mistake.  The maxim is: He who does not speak when he ought to speak, will not be heard when he ought to keep silence.

Now we call your attention to the evidence so far as the material parts are contained in the deposition of J. E. Putnam, one of the defendants.  We will read a portion of his testimony to refresh your recollection.  Mr. Putnam says:

I am the defendant in this action of ejectment brought by Miss Phœbe Tyler, in the Common Pleas Court of Clearfield county, No. 275 January Term, 1882.  I think I took possession, or rather J. E. Putnam & Co. took possession of the land for which suit is brought against me and also the land for which Miss Tyler brought suit against Charles W. Scates, about the month of June, 1874.

Before I took possession, David Tyler came to me and asked me if I knew that there was a piece of land, and pointed out to me where it was lying, between what was known as the Holt tract and the railroad, that is not patented, and I told him " No; I don't know it."  He also said, " There is another piece lying back of the Tyler farm "—if I remember right, on the north side of tract No. 4897—" that is not patented."  I said to 'Squire Tyler, " I supposed that this piece between the Holt tract and the railroad belonged to the Tyler farm," and

also said to Tyler, that "You cut the timber off of it." "Yes," Tyler says, "that's all right, that's all right." I don't remember certain whether I made the proposition to go to Harrisburg to get it patented, or whether he did. The arrangement was made between us that I was to bear the expenses of he and myself of whatever costs there were connected with it, of going to Harrisburg and getting it patented. We went, I think it was in June, 1874, and found that it had been patented. When the officials in the land office told us it was patented, Tyler said, "Gad, that's funny," and on our way back on the train coming home, I said to Tyler, "What shall I do now?" meaning, to find the title to this piece of land, and Tyler says, "I don't know." I think I said to him, "I will go and see Mr. Wallace, and have him look it up." There was no other conversation between us that I remember, on until I think it was in 1879 or 1880, I cannot fix the time.

It will be noticed that Putnam does not allege that Tyler expressly disclaimed title in the property; he (Tyler) stated that it was not patented. Then followed the visit to Harrisburg, and the discovery that it was patented.

[Now, except in so far as expressing the belief that the land was not patented, according to Mr. Putnam's own statement, there was no representation by Tyler that he had not at one time owned the land. There was no expression, no declaration of his, that the title was in any other person. Putnam seems to have acted, in his purchase of the alleged Coxe title afterwards, on the advice of his counsel; so it is alleged by the plaintiff.] [7] The defendants' statement is, that while Tyler did not expressly deny that he had title to this land, still he acted throughout as if he did not own it, while he did not expressly suggest that the title was in another person. Putnam seems to have assumed that a better title was in another, from what Tyler did not say, rather than from what he did say. He did not expressly claim it, nor expressly disclaim it, but acted, the defendants allege, in a way that led Putnam to believe that he was not the owner of the land.

Now we call your attention to Tyler's statement under oath:

I live in Huston township, Clearfield county, Pennsylvania. I am 73 years of age next March. I am acquainted with the land in dispute in this case. The land, of which this is a part,

originally embraced about 36 acres, more or less. I bought the land from Martin Nichols; Nichols conveyed it to me. In the same deed he conveyed another 100 acres to me. The two pieces were about three quarters of a mile apart. The larger piece lies on the north side of Bennett's Branch of the Sinnemahoning, and the smaller piece on the south side of the same stream. It was a year, or probably two years after I bought them before I got a deed for them. I got possession of them right after the purchase. The Nichols deed is recorded. I cut the timber off of the smaller piece several years ago. When I bought there was one year's taxes due on the larger piece. I can't say as to the smaller piece. I have always paid the taxes on this land from that time up to the present. After purchasing I had the land assessed to me.

I had two or three conversations with John E. Putnam before he began to improve on this land in dispute, about this 36 acre piece. I told him I had bought the land, and when I had bought it; I told him I had bought it from Martin Nichols. This was before I had cut any timber on the land. I think I had two or three conversations with Mr. Putnam about this land. There was talk of its being vacant land. Mr. Putnam got me to go to Harrisburg with him to see about it, and we found that it was not vacant land. When I found it was not vacant land I considered that the land belonged to me, unless we found a better title for it, since I had bought it and paid for it. I did not know but a better title might be found for it, as I did not know how it was at that time; I didn't know but that it had been sold with my other property at sheriff's sale, and if Mr. Putnam could get a good title for it, I would sooner that he would have it than anybody else—that is, if he could get a better title than anybody else had. I had not at that time examined to see whether it had been mortgaged and sold or not. The mortgage of which I speak had been given to William A. Wallace. That mortgage was foreclosed and the mortgaged land sold by the sheriff. Mr. Putnam told me afterwards that he had gone to a great deal of trouble to find the Coxe heirs; the heirs of the man who had owned the land, and had consummated the purchase from them. Mr. Putnam said that the title he had got was another title from the one I had got. He said he had now a good title. They were about commencing there

Charge of Court below.

on this 36 acre piece at this time. Samuel Filbert, of Williamsport, and John E. Putnam, were the first persons who seemed to exercise authority on this property.

This is a portion of the testimony of Mr. Tyler. You will remember the whole of the deposition, both of Mr. Tyler and Mr. Putnam. You will notice that there is no irreconcilable difference in the statements of Putnam and Tyler, as to just what was said, and what was done. Of course, if there be such a difference, it is for you to determine, but we do not notice any irreconcilable difference in their statements. Tyler apparently did not know that the 36 acres, consequently the two lots in dispute, were not included in his mortgage to Wallace, which passed under the sheriff's sale to Dill; he did not discover that it was not included in that mortgage until 1879 or 1880. He says himself, and it may here in the evidence be taken as an undisputed fact, that at the time Putnam was seeking to get title to the land, and during the time he (Putnam) was making improvements, Tyler did not know that he was the owner of the land. [That he did not know he was the owner of the land may be taken from the statements of both parties as an undisputed fact. He did not expressly say to Putnam that he was not the owner, and so far as the evidence shows, he did not say he was the owner. His conduct throughout was that of a man who had no claim on the land.

The undisputed evidence shows that he was innocent in so acting. There is nothing to show that he was guilty of intentional concealment in so acting, and it shows that he was innocent of any intention to wrong Putnam. He was ignorant of his own rights, as he states, until 1879 or 1880.][8] Even if he was ignorant of his own rights, and guilty of no intentional wrong towards Putnam, if Putnam was led to believe that he was not the owner of the land, it would estop him or his grantee from now setting up a claim against Putnam. Putnam had a right to assume that Tyler knew what land he owned, and if, relying upon the fact that Tyler did not claim to own it, he purchased another title and made improvements, the plaintiff could not recover. It was the fault of Tyler that he did not know he owned the land, and he ought to have known whether it was or was not included within the boundaries of the mortgage.

Now the defendants allege that their conduct in buying the Coxe title, and erecting the improvements was based entirely upon the supposition that Tyler had no right to the land, a supposition that was brought about by Tyler's conduct. Plaintiff replies, that the defendant was not misled by anything that Tyler did; that he (defendant) knew Tyler once owned the land, and from the undisputed evidence had cut timber from it. He (defendant) supposed with Tyler that the title had passed to Dill under the sheriff's sale. They first went to Harrisburg, expecting to find the title still in the commonwealth, but discovered that it was patented, and then Putnam, instead of being misled by anything that Tyler said, or going to Dill, who was the purchaser under the mortgage, to inquire, declared his intention of consulting counsel to "look the matter up." And in pursuance of this determination he went, not to Dill, to whom the conversation and acts of Tyler would have led him to go, and who might be supposed by both Tyler and Putnam to be the owner of the title, but to the devisees of one Wm. Coxe, and secured from them an independent outstanding title, as he supposed, took possession and made these improvements, believing that he had secured a better title than ever Tyler had, and consequently a better title than Dill, who had got the title that Tyler had; intending to set it up, and hold the land against all the world. This is what plaintiff alleges in reply.

Now if Putnam was not misled by anything said by Tyler, or anything done by him, then the plaintiff is not estopped by the mere fact that Tyler really owned the title. If, because of his ignorance of that fact, he failed to disclose it to Putnam, we say she is not estopped if he (defendant) was not misled by Tyler.

[What does the weight of the evidence show you was the motive in Putnam's conduct which led him to purchase the outstanding title? Was it the conduct of Tyler which led him to believe that he (Tyler) did not own the land, or, after the return from Harrisburg, was it the consultation with his counsel that led him to believe that the Coxe title was the valid title? That it was superior to the Tyler title, and if he purchased it, it would prevail against the Tyler title and against all other titles?][9] If he was misled by the conduct of Tyler to his (Put-

nam's) injury, if his (Putnam's) conduct and actions afterwards can be accounted for and are accounted for by and under the evidence on the theory that Tyler misled him by his failure to disclose a fact which he ought to have known, then plaintiff would be estopped, and could not recover. [On the other hand, if anything said or done by Tyler resulted in no injury to Putnam; if he acted with the belief that he was buying a better title than Tyler had, one that he could set up against the Tyler title, or any other title in purchasing the Coxe title, and took possession, intending to assert his right of possession under that title, then Putnam was not misled by anything Tyler said, and the plaintiff would not be estopped.][10]

It is just as you find the weight of the evidence in these particulars that turns your verdict for the plaintiff or defendants. Did Tyler mislead Putnam, or did Putnam buy the Coxe title, independent of anything that Tyler had said or done, intending to assert a superior or better title, as he believed, and hold the land? If he did, then Tyler's acts and silence did not hurt him. If, however, he acted on whatever Tyler said or did, then he was misled, and that by the man who ought to have had the knowledge and given him (Putnam) notice of it, and the plaintiff is estopped.

As to the treasurer's deed, we instruct you that the evidence on that point fails to show a valid and substantial outstanding title superior to the title the plaintiff claims.

The defendants have submitted the following propositions:

1. If the land on which the dwelling houses of Scates and Putnam are built is part of the hundred acres of unseated land of tract No. 4897 which was sold to Ebenezer Hewitt by Alexander Irwin, treasurer in 1828, then under the evidence in this case the plaintiff has no title and for that reason cannot recover.

Answer: We do not think that is the law, gentlemen, and deny this point. The evidence is not sufficient to pass the land under the alleged tax sale to Hewitt.[1]

2. Even if the plaintiff's title were otherwise good, still if David Tyler gave Putman to understand that he (Tyler) did not own this ground, and Putman then acting in good faith for himself and Scates purchased title to it from those whom they supposed to be the owners, and then had expensive dwelling

Charge of Court below.

houses put up on these lots, and the said Tyler all the while saw the buildings go up, and encouraged by his presence and conduct the making of said improvements, and during that time gave no notice that he objected to their erection, or that the land belonged to him, then under such circumstances neither David Tyler, nor his daughter, the present plaintiff, would be entitled to recover the improvements and ground on which they stand, and your verdict should be for defendants in such case.

Answer: This point is affirmed if, as we have already in-structed you, Putman relying on and acting on a belief induced by the conduct of Tyler, purchased an outstanding title, and made his improvements; but if, however, he acted in the belief that he was purchasing a title superior to and better than the Tyler title, and his subsequent conduct was on the faith of that title so purchased, he was not misled by Tyler.[2]

3. Especially is this the law when the lot without the improvements is worth very little, perhaps not as much as five dollars, while the improvements put on each lot amount to hundreds or thousands of dollars.

Answer: As to this point, we do not see that it is important in the view we have taken of the law, and therefore we do not affirm it.[3]

4. The ignorance of David Tyler of his own title or rights would not excuse him. He was presumed to know his own property, and if by his own acts, or by his acquiescence and silence when he ought to have spoken, the defendants were misled, he cannot take advantage of the error which was induced by his own conduct.

Answer: This point is affirmed. If the conduct of Tyler misled the defendant his ignorance would be no excuse for it; if he did not mislead the defendant then there would be no estoppel.

The verdict of the jury was in favor of the plaintiff, and judgment being entered thereon, the defendant took this writ, assigning for error:

1. The answer to the defendants' point.[1]
2. The answer to the defendants' second point.[2]
3. The answer to the defendants' third point.[3]
4–6. The parts of the charge embraced in [ ] [4 to 6]

7. The part of the charge embraced in [ ]⁷
8. The part of the charge embraced in [ ]⁸
9. The part of the charge embraced in [ ]⁹
10. The part of the charge embraced in [ ]¹⁰
11. The charge as a whole was erroneous and calculated to mislead the jury to the prejudice of the defendants.

*Mr. Joseph B. McEnally* (with him *Mr. Daniel W. McCurdy*), for the plaintiff in error:

1. The testimony of two surveyors, who had carefully examined the lines, was that one half or more of the defendants' lots was on the Tyler farm, to which the title of the plaintiff did not extend. It was error to tell the jury as a certain fact, that the two lots were within the 36 acres covered by her title.

2. The tax title obtained in 1828 by Ebenezer Hewitt, and by him conveyed in 1836 to Jones, Warner & Andrews, recorded in 1836, constituted under the evidence prima facie a good title to the unseated land within that tract, including the land now claimed by the plaintiff. The assessment of Wilhelm Willink, No. 4897, 100 acres, prima facie, meant the whole tract. If there was any doubt upon that point, it was for the jury. The court was not justified in treating it as matter of no account: Williston v. Colkett, 9 Pa. 38; Brown v. Hayes, 66 Pa. 229; Reading v. Finney, 73 Pa. 467.

3. The conduct of David Tyler in leading Putman to believe that he had no claim or title to this piece of land, and the encouragement given by him to Putman and Scates to build and improve upon it, created an estoppel, preventing him and his daughter, the plaintiff claiming under him, from recovering the said property upon which the improvements were made: McKelvey v. Truby, 4 W. & S. 323; Miller v. Miller, 60 Pa. 16; Woodard v. Tudor, 81* Pa. 382; Miller's Appeal, 84 Pa. 391; Lewis v. Carstairs, 5 W. & S. 205; Skiles's App., 16 W. N. 246.

4. In any event, whatever the plaintiff's title may be, inasmuch as the improvements were made in good faith and with the acquiescence of David Tyler, then owning the title, no recovery could be had by the plaintiff without paying for the improvements: 2 Story Eq. J. § 1237; Skiles's App., 16 W.

N. 246; McKelvey v. Truby, 4 W. & S. 323; Miller's App., 84 Pa. 391. The principles of equity certainly constitute part of the law of Pennsylvania.

*Mr. John H. Orvis* (with him *Mr. J. Frank Snyder*, *Mr. Frank Fielding* and *Mr. W. D. Bigler*), for the defendants in error:

1. The assessment of 4897,100 acres, Wilhelm Willink, was void for uncertainty. An assessment of a certain number of acres of land, without any other description or means of identity will not support a sale of the land for taxes as unseated land: Philadelphia v. Miller, 49 Pa. 440; Hess v. Herrington, 73 Pa. 438. But Jones, Warner & Andrews, to whom the tax title was conveyed in 1836, never asserted their title, never paid taxes, never exercised acts of ownership. It was a derelict and abandoned title. David Tyler had taken possession in 1853, cut the timber off it, and paid the taxes on it from that time on. An outstanding title, to be a protection, must be valid and subsisting, not one abandoned or barred by the statute of limitations: Hunter v. Cochran, 3 Pa. 105; Sheik v. McElroy, 20 Pa. 25; and available in favor of the party in whom it is alleged to exist: Wray v. Miller, 20 Pa. 111; Riland v. Eckert, 23 Pa. 215; McBarron v. Gilbert, 42 Pa. 268.

2. It is contended that David Tyler should have given defendants notice that he had the title. How could he, when he did not know it himself? Until 1879 or 1880, when creditors discovered that the 36 acres had been omitted from the Wallace mortgage, he supposed it had been sold thereon with his other lands. Besides, Putman had notice what Tyler's title was, for all the deeds were on record. The deed from Martin Nichols to Tyler was recorded in 1854, more than two years before Putman bought the Coxe title: Knouff v. Thompson, 16 Pa. 357. Silence will postpone only when silence is a fraud, which cannot be imputed to one who is ignorant of his rights: Robinson v. Justice, 2 P. & W. 19; Davidson v. Barclay, 63 Pa. 406; Lawrence v. Luhr, 65 Pa. 236.

OPINION, MR. JUSTICE CLARK:

The first question presented in this case is, as to the effect of the outstanding tax title in Jones, Warner & Andrews.

Why was not that title a valid defence against the plaintiff's recovery?

The lands in controversy are admittedly embraced within the lines of the Wilhelm Willink survey, which, in the years 1826 and 1827, was assessed in the unseated list as tract No. 4897, 100 acres, situated in Fox township, Clearfield county, surveyed in the name of Wilhelm Willink; for 1826, county tax, six cents, road tax, six cents; for 1827, county tax, five cents, road tax, six cents. For these taxes the tract was subsequently sold at treasurer's sale, and purchased by Ebenezer Hewitt to whom a deed was acknowledged and delivered under date of December 1, 1828. The owner failing to redeem, Ebenezer Hewitt, by his deed dated July 26, 1836, conveyed the same to Jones, Warner & Andrews, who, on August 11, 1836, placed both of the deeds mentioned upon record. The tract contained about 1000 acres, whilst it was assessed as containing only 100 acres; but there is nothing to indicate that a portion only of the tract was intended to be covered by the assessor's return. The return was of tract No. 4897, in the name of Wilhelm Willink, and the "100 acres," is but matter of description. At the time of the assessment, Martin Nichols held a conveyance for 750 acres off the west end, and Jonathan Nichols for 300 acres off the east end, the residue of the tract; but the whole was unseated, and it does not appear that the owners had made known their separate ownership, as required by the act of 1806, in order that their respective portions might be taxed separately. The Willink survey of 1794, was located across the surveys of 1785; the earlier surveys having previously appropriated all the land covered by No. 4897, excepting about 126 acres at the northwest corner, and 144 acres at the southwest corner; and, as the division line was afterwards run between Martin and Jonathan Nichols, the 126 acres at the northwest corner, and about 36 acres of the piece in the southeast corner fell to Martin, and the residue, being 100 acres, more or less, to Jonathan. It does not appear that there was any indication, at the time of the assessment, that any portion of the tract was laid upon lands already appropriated, or that the owners of the tract 4897 recognized the superior right of any earlier warrant. The conveyances from Alexander Boyd to Martin and Jonathan Nichols were of the whole tract, and nothing appeared

on the land or otherwise to show any relinquishment on the part of the holders of the Wilhelm Willink warrant. On the other hand, as we have said, the assessment was of the whole tract by its proper number in the name of the warrantee. It does not even appear that the lands covered by the warrants of 1784 were assessed, or that the taxes thereon were paid for the years 1826 and 1827, and if they were not, the tax deed of 1828 would, under all the cases, be effective to convey all the lands embraced within the lines of tract 4897.

It is only essential to the validity of a tax sale that the land be so designated in the assessment as to lead the owner to a knowledge of the fact that it is his land which is assessed: Dunn v. Ralyea, 6 W. & S. 475; McDermott v. Hoffman, 70 Pa. 31. The tract being unseated, the assessment by its proper number in the name of the original warrantee was sufficient, notwithstanding the misstatement of the number of acres: Williston v. Colkett, 9 Pa. 38; it is enough that the name in which it is assessed has been linked to the land by some known claim of title: Glass v. Gilbert, 58 Pa. 266.

Nor can the title of Jones, Warner & Andrews be regarded as an abandoned and derelict title. It is a general rule in ejectment, subject to well known exceptions, that the defendant may protect his own possession by showing an outstanding title in a third person; but it must be a subsisting title, such as would sustain an ejectment, and be available in favor of the party in whom it is alleged to exist. The effect of the tax sale after the lapse of two years, was to pass the title of the real owner to Ebenezer Hewitt. The conveyance from Hewitt to Jones, Warner & Andrews, was, therefore, of the absolute legal title to the land with all its incidents. It was not such a title as might be abandoned by mere delay in instituting an action. A man may abandon an improvement or a right of pre-emption, Whitcomb v. Hoyt, 30 Pa. 403, because continuity of possession is essential to its existence; or he may abandon a location by neglecting to follow it up by a survey in a reasonable time; or he may abandon an equity in lands; but Jones, Warner & Andrews were invested with the full legal title, and of such a title they could only be divested by an abandonment, the circumstances of which were sufficient to raise an estoppel, or when the possession is acquired by one

in consequence of the abandonment, and held by him under claim of title for the period of the limitation. When there is neither estoppel nor limitation there can be no abandonment, no matter how formal the act short of a conveyance, which can affect the rights of the holder of the legal title: Watson v. Gilday, 11 S. & R. 337. In Hoffman v. Bell, 61 Pa. 444, land warranted and surveyed in 1794 was sold to the county for the taxes of 1820; the treasurer made a deed in 1826, but as it was made after he had gone out of office it was void; the purchaser from the county paid the taxes for forty-eight years, and during that time the warrantee neither made claim nor paid taxes; held, that this great lapse of time without claim or payment of taxes by the warrantee was not an abandonment. " The owner's non-payment of taxes," says Mr. Justice SHARS-WOOD in the case cited, " cannot be considered as an abandonment of his title. The doctrine of abandonment does not apply to lands held by a perfect title, but only to imperfect titles by warrant and survey." So in Bunting v. Young, 5 W. & S. 188, where warrants were obtained from the commonwealth in 1793, the purchase money paid, surveys promptly made and accepted, it was held, that there could be no such thing as abandonment by which the title would be lost, and that it was error to submit that question to the jury. If this were an ejectment by Jones, Warner & Andrews, we can discover no reason why the tax deed to Hewitt and the conveyance from Hewitt to them, would not be available in their favor; and, if this be so, they should have been available in this case to protect the defendants' possession, for the plaintiff must recover on the strength of her own title.

Under the testimony of the surveyors, Read and Mitchell, the question of location should have gone to the jury. Phœbe Tyler, as we have said, must recover on the strength of her own title, and if it be true that one half or more of the lots of Putnam and Scates were in fact not within the lines of the 36 acres conveyed to her by David Tyler, she has shown no title which would justify her recovery of any land outside those lines. It will not do to say there never was any dispute as to the line of the Hutchinson survey; there is a dispute now, and the true location of the dividing line between the tracts was, under all the evidence, for the determination of the jury.

But as the difficulties we have suggested may be removed at the next trial, we come next to consider the question of estoppel. The defendants allege that David Tyler, and Phœbe Tyler, who holds under him, are in equity estopped from asserting title to this land. The doctrine of equitable estoppel is well settled under our decisions, and, so far as it applies to this case, is stated substantially in the cases following: Positive acts tending to mislead one ignorant of the truth, and which do mislead him to his injury are grounds of estoppel, though the party estopped were ignorant of his rights: Chapman v. Chapman, 59 Pa. 214. But the acts of a party, done in ignorance of his rights, will not operate as an estoppel, unless others have acquired rights on the faith of them: Newman v. Edwards, 34 Pa. 32; Duncan's Appeal, 43 Pa. 67. One who by a positive act induces another to purchase land of a third party, of which the former is the true owner, is estopped from setting up his title against the purchaser, though all parties acted in good faith, and in ignorance of the true state of the title: Miller's Appeal, 84 Pa. 391. When a person actually encourages or induces another to enter upon land and invest money or expend labor, he cannot afterward call in question such title, though he acted in ignorance of his own right: Woodward v. Tudor, 81* Pa. 382.

It appears to be undisputed that at the time of Putnam's purchase of the land in dispute in 1875, and for some time before and after that time, Tyler was ignorant of the real condition of the title; he had taken the timber off the thirty-six acres some years before, and thought the land was embraced in his mortgage to Wallace. If the land should prove to be vacant, however, as it was then supposed to be, it would still be available for Putnam. It was to ascertain this fact that the parties went to Harrisburg. Finding that the lands were patented, Putnam said to Tyler on his return home, "What shall I do now." Tyler replied, "I don't know." Putnam said, "I will go and see Mr. Wallace and have him look it up." Putnam says, he did see Mr. Wallace, and under *his advice* purchased the Coxe title. Subsequently improvements were made to the value of $10,000 or thereabouts. In 1879 or 1880, Tyler told Putnam he had found a deed to himself for this piece of land; it was the deed from Martin Nichols. An ex-

amination showed that the thirty-six acres had not been embraced in the Wallace mortgage. Now, if the acts and declarations of Tyler were such as to induce Putnam to make the purchase, and as matter of fact, upon the faith thereof, the purchase was made, Tyler would be estopped from afterwards setting up the true title against Putnam, although he may have been ignorant of his own rights at the time. What the actual inducement is to a purchase of real estate often involves an operation of the mind, which cannot always be shown, and in some cases, perhaps, the existence of certain facts will raise a presumption of injury. But, in this case, there is no pretence that Tyler encouraged the purchase of the Coxe title, or indeed of any other title. Putnam himself testifies, that he purchased the Coxe title under the advice of his attorney, whom he had employed to look the matter up. A question of fact is thus distinctly raised, viz.: Whether Putnam purchased relying in whole or in part upon Tyler's implied disclaimer, or upon the advice of his counsel. This question was, we think, one for the jury. The learned judge instructed the jury as follows: " It is just as you find the weight of the evidence in these particulars that turns your verdict for the plaintiff or defendants. Did Tyler mislead Putnam or did Putnam buy the Coxe title, independent of what Tyler had said or done, intending to assert a superior or better title, as he believed, and hold the land? If he did, then Tyler's acts and silence did not hurt him. If, however, he acted on whatever Tyler said or did, then he was misled, and that by the man who ought to have had the knowledge and given him (Putnam) notice of it, and the plaintiff is estopped." The verdict was for the plaintiff, and the inference is irresistible that the fact submitted was found for the plaintiff.

Nor do we find in the evidence any positive act of Tyler which can be treated as an inducement or encouragement to make improvements on the property after the purchase. The testimony upon this point is certainly very slight indeed. It is said, however, that he lived within half a mile, saw the improvements made, and gave no notice of his claim; but mere silence will not estop a party having title ; it will postpone only when silence is a fraud, which cannot be imputed to one who is ignorant of his rights: Folk v. Beidelman, 6 W.

339; Robinson v. Justice, 2 P. & W. 19; Owens v. Meyers, 20 Pa. 134; Davidson v. Barclay, 63 Pa. 406; Lawrence v. Luhr, 65 Pa. 236.

It is further contended, however, that although the plaintiff may be entitled to recover the land, he can only do so upon payment to Putnam of the value of his improvements; that the defendant has an equitable lien for his improvements, and a right of possession till that lien is satisfied; that Putnam was a bona fide occupant under claim of title, and made useful and permanent improvements in betterment of the estate, believing himself to be the owner, and that he is entitled to have the value thereof before he can be obliged to surrender the possession.    We have no statute in Pennsylvania upon this subject, except as to the recovery of land sold for taxes: Act of April 3, 1804, 6 Sm. L. 301 [4 Sm. L. 201]; Act of April 12, 1842, P. L. 265.    The principle of the common law is, that the rightful owner is under no obligation to pay for improvements which he never authorized: Gregg v. Patterson, 9 W. & S. 209.    It is now an established principle, however, to allow a bona fide occupant, under color of title, to mitigate the claim for damages and mesne profits by introducing proof of the value of permanent and useful improvements. This principle was engrafted upon the common law through the medium of equity: Sedg. & Waite on Trial of Title, 691; Walker v. Humbert, 55 Pa. 407; Morrison v. Robinson, 31 Pa. 456.    The general policy of the law, where no statute intervenes, is to allow the value of improvements only by way of set-off against or in mitigation of damages for the detention of the land, and the value of betterments cannot, therefore, usually exceed the amount of the plaintiff's damages and mesne profits: Sedg. & Waite, 698.

It is a well settled principle of equity, moreover, that when a bona fide possessor of property makes meliorations upon it, in good faith and under an honest belief of ownership, and the real owner is for any reason compelled to come into a court of equity for relief, that court, applying the familiar maxim that he who seeks equity must do equity, will compel him to pay for those improvements, as far as they are permanently beneficial to the estate and enhance its value: Story's Eq., 779; Pomeroy's Eq., 1241; Skiles's Appeal, 16 W. N. 246.

This is the extent to which the courts of this state have gone in allowing for improvements, and it will be seen that the claim of the defendants cannot in this case be sustained.

> The second, third, seventh, eighth, ninth and tenth assignments are not sustained; but upon the first, fourth, fifth, sixth and eleventh the judgment is reversed, and a venire facias de . novo awarded.